IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

SANDRA MONTGOMERY,    )
    )
    Plaintiff,    )
    )
v.    )    Case No. 1:04-cv-361-MEF
    )    (WO)
JOHN WHITE, *et. al.*,    )
    )
    Defendants.    )

## MEMORANDUM OPINION AND ORDER

Plaintiff Sandra Montgomery brings suit against John White, Clifford Jarrett, T.J. Phillips, Mamie Grubbs, and the City of Dothan, Alabama. Montgomery alleges race discrimination and retaliation in violation of 42 U.S.C. §§ 1981 and 1983 in connection with the termination of her employment at the City of Dothan Jail. This cause is before the Court on Defendants' Motion for Summary Judgment (Doc. # 49) filed on June 7, 2006.

### I. Jurisdiction and Venue

The Court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1343 (civil rights). The parties do not contest personal jurisdiction or venue, and the Court finds adequate allegations of each.

### II. Summary Judgment Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact

and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323.  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324.  To avoid summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  On the other hand, a court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor.  *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *McCormick v. City of Fort Lauderdale,* 333 F.3d 1234, 1243 (11th Cir. 2003) (the evidence and all reasonable inferences from the evidence must be viewed in the light most favorable

to the non-movant).  After the non-moving party has responded to the motion for summary

judgment, the court must grant summary judgment if there is no genuine issue of material

fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P.

56(c).

> The mere existence of some factual dispute will not defeat
> summary judgment unless that factual dispute is material to an
> issue affecting the outcome of the case.  The relevant rules of
> substantive law dictate the materiality of a disputed fact.  A
> genuine issue of material fact does not exist unless there is
> sufficient evidence favoring the nonmoving party for a
> reasonable jury to return a verdict in its favor.

*Chapman v. AI Transp.,* 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v.*

*City of Miami,* 52 F.3d 918, 921 (11th Cir. 1995) (internal marks and citations omitted)).

### III. Facts

At all relevant times, Montgomery was employed by the City of Dothan in the City

of Dothan Jail.  She was hired on May 17, 1992 as a Jail Security Officer (hereinafter

"JSO").  Her responsibilities were to book inmates, secure their property, and escort them to

jail.  She was promoted to Jail Security Sergeant (hereinafter "JSS") in 1995.  As a JSS, she

had the same duties as a JSO and was responsible for all booking procedures and supervision

of the JSOs.  She remained a JSS until her termination on July 18, 2003.  Throughout her

employment, Montgomery was supervised by Defendant Mamie Grubbs, who at all relevant

times was Warden of the City of Dothan Jail.  Warden Grubbs was supervised by Defendants

T.J.  Phillips and Clifford Jarrett.  At all relevant times, Phillips was a Sergeant and Jarrett

was a Lieutenant at the City of Dothan Jail.

A.    *Past Disciplinary Actions*

In August 1992, an inmate under Montgomery's supervision escaped, which resulted in Montgomery receiving an unsatisfactory rating for "Basic Task 1" on her job performance evaluation.   She received an "at expected level" rating in all other categories.   On the evaluation, Warden Grubbs (then known as Warden Saffold) noted that "[w]ith the exception of one incident noted on page one [the inmate escape] J.S.O. Montgomery's work performance is satisfactory and she has applied herself well since her employment."

According to Warden Grubbs, on August 16, 2000, she gave the jail staff a standard order not to let a particular inmate out without two police officers or jail staff in the block because of his mental condition and assault risk status.   On August 17, 2000, Montgomery gave permission to JSO Michael Harden to let the inmate out of his cell without having two police officers or jail staff in the block.   As a result, Montgomery was issued a minor disciplinary warning.   Montgomery refused to sign the warning and filed a PD-12[1] setting forth her view of this incident.   In the PD-12, she asserts that manpower was a problem at the jail and that she manned the docket alone with only one other jailer.   JSO Harden asked her permission to take the inmate out of his cell to shower, and she gave JSO Harden permission after JSO Harden had told her that the inmate's demeanor had been acceptable throughout the day.   She further asserts that the inmate was returned to his cell without incident.

_____

[1] A PD-12 is form used by officers to provide written explanations of events.

Moreover, in her deposition, Montgomery stated that the standard order from Warden Grubbs was not issued until after the inmate had been allowed out. JSO Harden, a white male, was also disciplined for this incident. Despite this incident, Montgomery received generally satisfactory performance evaluations in 2001 and in May 2002. In her 2001 evaluation, Lieutenant Jarrett stated that she had "the potential to be an exceptional supervisor."

In November 2002, Montgomery was disciplined for another minor offense. According to the Disciplinary Action Report, Montgomery violated Personnel Rule 3-41(7) by failing to comply with Standard Operating Procedure (hereinafter "SOP") #21(H).[2] The report states that, on October 31, 2002, Montgomery allowed JSO Robinson to give an inmate insulin that was outdated and not the property of that inmate. The warning recommended formal counseling. Montgomery refused to sign the warning because she did not believe she had violated a rule. First, she asserts that the jail had a policy whereby the jail would order insulin and provide it to inmates who needed it. The inmate was unable to get in touch with her family to get insulin, so Montgomery approved giving her insulin from the jail's supply. Second, Montgomery asserts that the insulin given to the inmate was not outdated, but was a brand new bottle of insulin. She claims that after the inmate was given

---

[2] SOP #21(H) provides that

[m]edication will only be delivered to the person to whom it was labeled. The giving of one person's medication to another inmate is strictly prohibited. This includes situations where two inmates have been prescribed the same medication and one inmate's medication is not available. The fact that the City may have paid for the medication does not alter this.

5

the insulin, someone working the day shift threw out all of the new insulin bottles in the cabinet and left an outdated one so that Montgomery could be disciplined.  JSO Robinson did not receive a disciplinary action because Montgomery refused to give her one.

In her 2003 performance evaluation, Montgomery received unsatisfactory ratings for poor cooperation with her supervisors and for safety consciousness due to the insulin incident.  However, she received an overall satisfactory rating.  Sergeant Phillips stated that Montgomery "is a very good supervisor and a hard worker. . . . JSS Montgomery is a hard worker and a valuable asset to the jail."  Warden Grubbs stated that Montgomery was doing a good job, was very dependable, and had made improvements following the warning about the insulin incident.

B.    *July 11, 2003 Incident Resulting in Termination*

On Friday, July 11, 2003 at approximately 1:00 a.m., inmate Claude Burns was brought to the jail.  At the time, Montgomery, JSO Stacy Mills, and Sergeant Charles Parker were on duty.[3]  Pursuant to the booking procedures, Burns was brought to the docket counter to be booked by JSO Mills.  Part of the booking process involves the JSO performing a medical screening of the inmate and completing a medical screening form.  Burns' medical screening form indicates that he had a stab wound in his left upper arm.  In addition, a video recording of the booking process shows that Burns told JSO Mills that he had a stab wound.

During the time that Burns was being booked by JSO Mills, Sergeant Parker was

---

[3] JSO Mills and Sergeant Parker are both white.  Several weeks earlier, JSO Mills had tendered her resignation, and July 11, 2003 was her last day on the job.

behind the docket counter.  He was separated from JSO Mills and Burns by a bulletproof glass window with an opening at the bottom so that paperwork can be passed back and forth. Inmates being booked can be seen clearly through the glass, but it may difficult to hear what is being said during the booking process.  At one point during the booking process, Montgomery walked through the doorway next to the docket counter into the area where Sergeant Parker was located.

At approximately noon that same day, JSO Banks began processing Burns.  When JSO Banks asked Burns to remove his clothing to change into his jail uniform, JSO Banks noticed two socks wrapped around Burns' left arm as a bandage.  JSO Banks asked Burns to remove the socks and noticed that he had a sizeable wound.  JSO Banks asked Burns if he had notified anyone of the injury.  Burns stated that he told the police officer that he had an injury, but that he did not want to be medically treated because his son or stepson had stabbed him during an argument he had with the boy's mother and he did not want the boy to get in trouble.  Burns said that he also told the woman who booked him that he had been stabbed, but that he did not want any medical attention.  JSO Banks then told Burns to put his clothing back on and immediately reported the injury to Sergeant Mixon and Sergeant Lewis.  Warden Grubbs was also informed of the situation.  Sergeant Mixon looked at the wound and asked whether any jail personnel knew about it.  Burns repeated that he had only told the jailer who booked him and that he did not want medical attention.  At that point, Burns was transported to the hospital.

7

When Montgomery came back on duty that night, Warden Grubbs called Montgomery to find out if she was aware that Burns had a stab wound. Montgomery stated that she was not aware of the injury. Warden Grubbs asked her to write a PD-12 and have everyone else write one too. Montgomery then called Sergeant Parker at home to ask him if he had noticed anything about Burns and Sergeant Parker stated that he was not aware of anything. Warden Grubbs did not ask Sergeant Parker to provide a PD-12.

On Monday, July 14, 2003, Warden Grubbs received PD-12s from Montgomery and JSO Mills. Montgomery's PD-12 stated that at no time during the booking process was she notified that Burns needed medical attention and that Burns never asked for medical treatment. That day, Warden Grubbs also reviewed the video recording of Burns' booking. In Warden Grubbs' opinion, the booking tape directly contradicted Montgomery's assertion that she did not know anything about Burns' wound. Warden Grubbs believes that the booking tape shows Montgomery standing next to JSO Mills during Burns' booking and observing JSO Mills lift Burns' shirt to examine the stab wound. Warden Grubbs asserts that the booking tape shows that Montgomery was aware of the injury, and thus that Montgomery had misrepresented the facts to Warden Grubbs when she stated in her PD-12 that she knew nothing about the injury. Warden Grubbs could not determine from the tape whether or not Sergeant Parker was aware of the stab wound. In her PD-12, JSO Mills stated that she did not inform Montgomery "by word of mouth" of Burns' injury. Furthermore, Chief White sent a memo to Personnel Director Kai Davis stating that, "Officer Stacy Mills committed

8

a serious breach of regulations.  Jail Security Officer Mills failed to notify her immediate supervisor of a significant injury to an inmate and then falsified an official document regarding this fact."  Warden Grubbs and Chief White assert that JSO Mills would have been disciplined for this incident had it not been her last day of work.

On July 15, 2003, Warden Grubbs issued two disciplinary warnings to Montgomery for the Burns incident.  The first disciplined Montgomery for violating Personnel Rule 3-42(6) - "action(s) or lack of action(s) that could endanger the life or health of self or others, that could cause undue financial loss to the City, and/or negligence in carrying out assigned tasks or duties or responsibilities of one's position."  Such violation is in the "major category" and thus requires a final warning and suspension.  The second warning disciplined Montgomery for violating Personnel Rule 3-43(5) - "deliberate falsification of records and personal misrepresentation of statements given to a Supervisor."  Such violation is in the "intolerable category" and thus warrants discharge.  Warden Grubbs delivered both warnings to Montgomery at her home on July 15, 2003.  Warden Grubbs also informed Montgomery that she was being placed on administrative leave pending a determination hearing.

A determination hearing was held by Police Chief White on July 17, 2003.  At the hearing, Montgomery was permitted to present her position both orally and in writing. Montgomery's written statement alleges that at one point she was going in and out of the docket room and heard JSO Mills ask Burns about his medical history and injuries, but that she was not following the conversation closely enough to know if they were discussing old

9

or new injuries.  Montgomery also stated that she never saw the wound or any evidence of a wound.  Chief White alleges that Montgomery never raised the issue of race discrimination or retaliation in the hearing, but Montgomery believes that she did.

After the determination hearing, Chief White issued a Decision of the Determination Hearing which stated:

> Following a determination hearing held on July 17, 2003 at 10:00 AM, and a careful and thorough review of the materials provided by you and your supervisors, it has been determined that you violated Personnel Rule Section 3-42 (6) . . . The offense, having been sustained, warrants a disciplinary action of a Final Written Warning and a suspension of 20 days.  In addition, a determination has been made that you also violated Personnel Rule Section 3-43 (5) . . . (Intolerable Category, 1st Offense) . . . Violating a rule listed in the Intolerable Category warrants a discharge.  Effective immediately, your employment is hereby terminated.

The decision also notified Montgomery that she could appeal the disciplinary action by filing a timely written appeal with her department head and the Personnel Board.

Montgomery filed a written appeal in which she stated that she felt that there were other issues that should have been discussed at the determination hearing and that other employees should be permitted to express their feelings and testify to the fact that the jail needs to review all of its procedures.  On August 15, 2003, the Personnel Board held a hearing on Montgomery's termination at which Montgomery was permitted to present witnesses and exhibits.  At the hearing, Montgomery presented witnesses who testified that there were problems with the medical procedures at the jail, specifically that police officers were permitted to bring in injured inmates.  Montgomery asserted that the police officers

violated their personnel rules[4] by bringing in an injured inmate, but that they were not punished.   Defendants contend that Montgomery never raised the issue of race discrimination or retaliation during the appeal hearing, but Montgomery believes that she did.  Montgomery asserts that when she was presenting evidence at the hearing, the white members of the Personnel Board just laughed at her and paid no attention to her defense. In a written opinion dated October 12,[5] the Personnel Board stated that it found "substantial evidence" to support the department head's decision, and therefore affirmed Montgomery's termination.  The opinion was signed by the three white members of the board, but was not signed by the two black members, one of whom was the chairperson.  The fact that they did not sign, however, does not necessarily indicate that they disagreed with the opinion.

After the Personnel Board upheld her termination, Montgomery sent a letter to the Equal Employment Opportunity Commission ("EEOC") protesting her termination.  In the letter, she alleges that she was terminated for making complaints about favoritism, racial prejudice, gender discrimination, safety procedures, and overall working conditions.  On November 10, 2003, the EEOC issued a letter stating that Montgomery failed to state a *prima facie* claim, and that if she were to file a charge with the EEOC, that charge would be immediately dismissed for "failure to describe a violation of Federal law."

---

[4] Police officers and jail officers operate under different sets of personnel rules.

[5] The year on the opinion is 2002, but the Court presumes it was 2003, since all of the relevant events occurred in 2003.

11

C.    *Facts Relevant to Retaliation Claim*

In June 2003, JSO Shannon Obert complained to Personnel Director Kai Davis about sexual harassment by JSS Harden.  In order to investigate this claim, Davis interviewed a number of individuals, including Montgomery.  Montgomery contends that she complained to Davis about race discrimination during this interview, specifically that Lieutenant Jarrett and Sergeant Phillips had subjected herself and others to racial harassment and discrimination.[6]  Davis does not recall Montgomery mentioning race discrimination, nor do Davis' notes from the interview reflect that Montgomery brought up race discrimination. After the investigation was completed, JSS Harden was recommended for termination and resigned under the threat of termination.  Montgomery alleges that she attempted to discipline Harden, who was at that point a JSO, for his harassing behavior in 2002, but was prohibited from doing so by Warden Grubbs.  Warden Grubbs told Montgomery that Liuetenant Jarrett and Sergeant Phillips would take care of it, but JSO Harden was not disciplined and was later promoted to JSS.

Montgomery asserts that at approximately 5:45 a.m. on July 11, 2003, Warden Grubbs asked her if she wanted to participate in an internal affairs investigation of whether Lieutenant Jarrett and Sergeant Phillips had engaged in racial harassment and race discrimination.  Montgomery said yes, but was terminated shortly thereafter, thus did not

_____

[6] Montgomery asserts that she personally heard Lieutenant Jarrett refer to blacks as "monkeys" and that JSO Beck and Warden Grubbs had heard both officers use racial slurs. Montgomery also asserts that these officers denied black employees training, travel requests, and requests for help when staffing levels were low.

12

actually participate in the investigation. Montgomery believes that other jail employees went forward with filing a complaint but none of them were terminated because of their participation.

## IV. Discussion

Montgomery asserts a 42 U.S.C. § 1981 claim (via 42 U.S.C. § 1983) against the City of Dothan and the individual Defendants in their official capacities, alleging race discrimination and retaliation in her discipline and termination. Montgomery also asserts a § 1981 claim against the individual Defendants in their individual capacities for the same reasons.

A.      *§ 1981 Claim Against the City of Dothan*

Through § 1981, "Congress intended to prohibit 'all racial discrimination, private and public, in the sale of property'" and in the making and enforcement of contracts. *Runyon v. McCrary*, 427 U.S. 160, 170 (1976)(quoting *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 437 (1968)). It is the aim of these "statutes . . . to remove the impediment of discrimination from a minority citizen's ability to participate fully and equally in the marketplace." *Brown v. American Honda Motor Co., Inc.*, 939 F.2d 946, 949 (11th Cir. 1991).

While § 1981 provides a cause of action against state actors, a § 1981 claim against a state actor must be made pursuant to § 1983. *Butts v. County of Volusia*, 222 F.3d 891, 893 (11th Cir. 2000). Accordingly, the limitations on *respondeat superior* liability applicable to § 1983 apply to § 1981 as well. *Id.* at 894 n.4. That is, the City may not be held liable

13

under § 1981 pursuant to a theory of *respondeat superior*.  *Grech v. Clayton County, Ga.*, 335 F.3d 1326, 1329 (11th Cir. 2003)(citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).  Municipal liability may be based only upon "(1) an action taken or policy made by an official responsible tor making final policy in that area of the city's business; or (2) a practice or custom that is so pervasive, as to be the functional equivalent of a policy adopted by the final policymaker." *Church v. City of Huntsville*, 30 F.3d 1332, 1343 (11th Cir. 1994).  Montgomery does not contend that the City has a formal policy of race discrimination.  Therefore, the Court must only consider whether the City has a custom of race discrimination so pervasive as to be the functional equivalent of a policy.

Under the "custom" approach, it is necessary for the plaintiff to show a persistent and widespread practice of discrimination.  *Id.* at 1345.  Furthermore, actual or constructive knowledge of such custom must be attributed to the governing body of the municipality.  *Id.* Montgomery first points out that, for the past 31 years, the City has been under a consent decree entered by this Court to enjoin it from discriminating against blacks in the terms and conditions of employment.  Montgomery asserts that the fact that the City has not moved the Court for relief from the provisions of the consent decree is evidence that the City is not in compliance with its terms, and thus that the City has a custom of race discrimination.  However, Montgomery presents no evidence to support her assertion that the City has not

14

complied with the consent decree,[7] therefore cannot establish a custom of race discrimination on the basis of the consent  decree.  Second, Montgomery alleges that Personnel Director Davis never investigated a complaint by three black jail employees who stated that they had been subjected to racial harassment by City officials.   Though this allegation is disputed by Defendants, even if true, random acts or isolated incidents are insufficient to establish a custom or practice.  *Id.*   One failure to investigate a complaint does not rise to the level of a custom that is so pervasive that it is functionally a City policy.

As Montgomery has failed to show that the City has a custom of race discrimination, the City cannot be held liable under § 1981, and summary judgment is due to be granted in favor of Defendants on Montgomery's § 1981 claim against the City.[8]

B.    *§ 1981 Claims Against the Individual Defendants*

Montgomery has asserted claims against Defendants White, Jarrett, Phillips, and Grubbs in their individual capacities pursuant to § 1981.  Defendants contend that all of these individual Defendants are entitled to qualified immunity, and thus that these claims should be dismissed.

---

[7] In her brief in opposition to defendants' motion for summary judgment, Montgomery states that "[c]lear evidence of this continued non-compliance is present in the facts surrounding the instant case."  However, even viewing the facts in the light most favorable to Montgomery, she has not presented any evidence that these facts have resulted in a finding that the City has not complied with the consent decree.

[8] The same is also true of any claims Montgomery may be asserting against the individual Defendants in their official capacities and of her Fourteenth Amendment claim against the City, as both of these are also covered by the same § 1983 standards.  *Cooper v. Dillon*, 403 F.3d 1208, 1221 (11th Cir. 2005).

15

The qualified immunity doctrine insulates government agents from personal liability for money damages for actions taken in good faith pursuant to their discretionary authority. *Harlow v. Fitzgerald*, 457 U.S. 800 (1982). The test for good faith turns on the objective reasonableness of the official's conduct in light of established law: "government officials . . . generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id*. at 818. The Eleventh Circuit applies this standard using a two-step analysis. First, the court must determine whether the official was acting within his or her discretionary authority when the allegedly wrongful act occurred. If the official was acting within his or her authority, the court must then determine whether the plaintiff has established that the official's conduct violated a clearly established statutory or constitutional right. *Sims v. Metro. Dade County*, 972 F.2d 1230, 1236 (11th Cir. 1992). Clearly established law consists of either controlling authority in the jurisdiction at the time of the incident or a consensus of cases of persuasive authority. *Wilson v. Layne*, 526 U.S. 603, 617 (1999).

Montgomery concedes that the individual Defendants were acting within their discretionary authority, thus the Court must only determine whether Montgomery has met her burden of proving that the Defendants' actions violated clearly established statutory or constitutional law. The United States Supreme Court has set forth a two-part test for courts to apply when making this determination. The court must first ask the following threshold

16

inquiry: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional [or statutory] right?" *Brosseau v. Haugen,* 543 U.S. 194, 197 (2004) (quoting *Saucier v. Katz,* 533 U.S. 194, 201 (2001)). "If no constitutional [or statutory] right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier,* 533 U.S. at 201. However, "[i]f a constitutional [or statutory] right would have been violated under the plaintiff's version of the facts, 'the next, sequential step is to ask whether the right was clearly established.'" *Vinyard v. Wilson,* 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Saucier,* 533 U.S. at 201).

Thus, the Court must first decide whether the individual Defendants violated § 1981 either by race discrimination or retaliation.

### 1. Race Discrimination Claims

Montgomery alleges race discrimination in her discipline, termination, and other terms and conditions of employment.

As an initial matter, a number of Montgomery's claims relating to discipline and terms or conditions of employment are time-barred. The statute of limitations for § 1981 claims is four years. *See Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369 (2004). As Montgomery's complaint was filed on April 19, 2004, any alleged discrimination occurring prior to April 19, 2000 is time-barred. This includes the 1992 discipline for the inmate escape and any alleged discriminatory remarks and discrimination with respect to training

17

that occurred prior to April 19, 2000.

Section 1981 requires proof of *intentional* discrimination. *General Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 391 (1982); *Brown v. American Honda Motor Co.*, 939 F.2d 946, 949 (1991). Discriminatory intent can be established through either direct or circumstantial evidence. *See United States Postal Serv. Bd. of Gov. v. Aikens*, 460 U.S. 711, 714 n. 3 (1983). Where, as here, a plaintiff seeks to prove intentional discrimination through circumstantial evidence of the employer's intent, the court applies the familiar tripartite burden-shifting analysis promulgated by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) and *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248 (1981).[9]

Under this framework, Montgomery has the initial burden of establishing a *prima facie* case by a preponderance of the evidence. *See McDonnell Douglas*, 411 U.S. at 802. A plaintiff establishes a *prima facie* case of race discrimination by showing that "(1) [s]he belongs to a racial minority; (2) [s]he was subjected to adverse job action; (3) [her] employer treated similarly situated employees outside [her] classification more favorably; and (4) [s]he was qualified to do the job." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

As to any pre-termination incidents, Defendants assert that Montgomery's *prima facie*

_____

[9] The Court notes that in *McDonnell Douglas*, the Supreme Court articulated the tripartite framework for analyzing claims brought under Title VII. However, the allocation of burdens and elements of a *prima facie* case are the same for employment claims stemming from Title VII and Section 1981. *See Richardson v. Leeds Police Dept.*, 71 F.3d 801, 805 (11th Cir. 1995); *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1060 (11th Cir. 1994); *Howard v. BP Oil Co., Inc.*, 32 F.3d 520 (11th Cir. 1994).

case fails because none of these alleged incidents constitute adverse employment actions. In order to prove an adverse employment action, a plaintiff must show

> a *serious* and *material* change in the terms, conditions, or privileges of employment.  Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances.

*Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001).  In addition to her termination, Montgomery asserts race discrimination as to the August 2000 and November 2002 disciplinary warnings.  These disciplinary warnings were not adverse employment actions because they did not result in any change in Montgomery's employment.  She still received overall satisfactory performance evaluations and her terms, conditions, and privileges of employment remained the same.  Montgomery also alleges that she was denied training opportunities that were given to other sergeants.  Even if true, Montgomery does not provide any evidence that such denial resulted in a serious or material change in her employment, therefore the alleged denials of training were not adverse employment actions. Finally, Montgomery contends that her shift was always short-staffed but she was never permitted to call in additional staff, whereas other sergeants were permitted to call in help. This allegation, if true, does not constitute a serious enough change in Montgomery's employment to constitute an adverse employment action.  Therefore, as to all pre-termination race discrimination claims, Montgomery has failed to establish a *prima facie* case of a § 1981 violation.  Because the individual Defendants did not violate § 1981, they are entitled

to qualified immunity from any claims for monetary damages.

As to Montgomery's termination, Defendants argue that she cannot establish a *prima facie* case because she cannot show that similarly situated employees outside her classification were treated more favorably. In order to compare a plaintiff's treatment to that of non-minority employees, the plaintiff must show that she and the other employees are similarly situated "in all relevant aspects." *Holifield*, 115 F.3d 1562. "[I]t is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in difference ways." *Id.* The Eleventh Circuit requires that the "quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999). Montgomery identifies JSO Darrell Phillips, a white male, as a similarly-situated employee. On November 3, 2003, JSO Phillips received a disciplinary warning for violation of Personnel Rule 3-41(7) - failure to comply with standard procedures. This offense is in the Minor Offense category and warrants Formal Counseling. The Disciplinary Action Report form states that on October 13, 2003, JSS Tisdale was watching the monitors and saw that JSO Phillips did not go into the blocks to do a watch tour. JSO Phillips' supervisor asked him if he did a watch tour and he stated that he had. The Court will assume, without deciding, that JSO Phillips is a similarly-situated employee who was disciplined differently. As there appears to be no dispute as to the other factors necessary to establish a *prima facie* case, the Court will

assume that Montgomery has established a *prima facie* case of race discrimination as to her termination.

Thus, the burden shifts to Defendants to rebut the inference of race discrimination by presenting legitimate, non-discriminatory reasons for Montgomery's termination. *Holifield*, 115 F.3d at 1564. This burden is "exceedingly light." *Id.* Defendants assert that Montgomery was terminated for violating Personnel Rule 3-43(5) - "deliberate falsification of records and personal misrepresentation of statements given to a Supervisor." Warden Grubbs alleges that when she viewed the booking tape of Burns' booking, it was clear that Montgomery saw JSO Mills lift Burns' sleeve to examine the stab wound, yet Montgomery told Warden Grubbs that she was not aware of the wound. Defendants assert that this misrepresentation is the reason Montgomery was terminated. This is sufficient to meet Defendants' burden of providing a legitimate, non-discriminatory reason for the termination.

In order to succeed on her race discrimination claim, Montgomery now has the burden of demonstrating that the Defendants' articulated reason for her termination is a mere pretext for discrimination. *Holifield*, 115 F.3d at 1565. Montgomery must demonstrate that the Defendants' proffered reason is unworthy of credence, or that the Defendants were more likely motivated by a discriminatory reason. *Id.* Montgomery asserts that no reasonable person could have viewed the booking tape and concluded that Montgomery knew about the wound. Defendants respond that Warden Grubbs in good faith believed that Montgomery knew about the wound and lied about it. The Court finds that a reasonable person viewing

21

the booking tape could conclude that Montgomery was aware of the wound and that Warden Grubbs had a good faith belief that Montgomery knew about the wound. The fact that Montgomery may not have actually known about the wound is not enough to establish pretext. If an employee is fired upon the good faith but mistaken belief that the employee violated a personnel rule, this does not establish that the termination was because of her race. *See Elrod v. Sears Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991). Therefore, Montgomery has failed to prove that her termination was due to race discrimination in violation of § 1981. Thus, the Court need not decide whether the right was clearly established and the individual Defendants are entitled to qualified immunity on Montgomery's § 1981 termination claim.

    2.    *Retaliation Claims*

Montgomery alleges that she was terminated for her participation in a sexual harassment investigation and her statement to Warden Grubbs that she would be willing to participate in a race discrimination complaint. Although Section 1981 does not specifically reference retaliation, the Eleventh Circuit has held that § 1981 encompasses claims of retaliation in the employment discrimination context. *See Andrews v. Lakeshore Rehabilitation Hosp.*, 140 F.3d 1405, 1412-13 (11th Cir. 1998). Though the Eleventh Circuit has not definitively decided that the elements of a § 1981 retaliation claim are the same as the elements of a Title VII retaliation claim, the parties here appear to base their arguments on the Title VII framework, thus the Court will apply this framework as well.

22

Like the tripartite framework used to establish a claim of discrimination, the plaintiff must first establish a *prima facie* case of retaliation.  In order to establish a *prima facie* case, the plaintiff must show that "(1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression." *Wideman v. Wal-Mart Stores, Inc*., 141 F.3d 1453, 1454 (11th Cir. 1998).

Once the plaintiff satisfies the elements of a *prima facie* case, a presumption of retaliation is created and the burden then shifts to the employer.  *See Hairston v. Gainesville Sun Pub. Co.,* 9 F.3d 913 (11th Cir. 1993).  The employer can rebut the presumption only by articulating legitimate, non-retaliatory reasons for its adverse action.  *See id*.  "This intermediate burden is 'exceedingly light.'"  *Holifield*, 115 F.3d at 1564 (citation omitted).  The employer has the burden of production, not of persuasion, and thus does not have to persuade a court that it was actually motivated by the reason advanced.  *See McDonnell Douglas*, 411 U.S. at 802.

Once the employer satisfies this burden of production, "the presumption of [retaliation] is eliminated and 'the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima-facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'"  *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) (citations omitted).  After an employer

23

proffers non-retaliatory reasons for its actions, "a plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered . . . reasons is pretextual." *Chapman*, 229 F.3d at 1037.

a.   *Sexual Harassment Investigation*

Montgomery alleges that she was terminated for her participation in the investigation of JSO Obert's sexual harassment complaint.  Defendants assert that this retaliation claim must fail because her participation did not constitute "protected conduct" under § 1981.  In the Eleventh Circuit, it is not clear what types of protected conduct are covered by retaliation claims made pursuant to § 1981.  *See Olmstead v. Taco Bell Corp.*, 141 F.3d 1457, 1463 n.4 (11th Cir. 1998).[10]  However, the Court need not decide this issue in order to determine whether Montgomery has a viable retaliation claim for her participation in the sexual harassment investigation.  Even assuming that her interview in relation to the investigation was protected conduct, and assuming that she has satisfied the other two elements required to establish a *prima facie* case of retaliation, the Defendants have proffered a legitimate, non-retaliatory reason for her termination.  As discussed in relation to the race discrimination claim, Defendants assert that Montgomery was terminated due to her misrepresentation to Warden Grubbs concerning her knowledge of Burns' wound.  This reason is enough to meet Defendants' burden.  As with the race discrimination claim, Montgomery has failed to show that this reason is a pretext for retaliation.  It is clear that Warden Grubbs had a good faith

---

[10]Nor does any other Circuit appear to have resolved this issue.

24

belief that Montgomery misrepresented facts to her.  Even if Warden Grubbs was mistaken, this does not establish that Montgomery's termination was in retaliation for her participation in the sexual harassment investigation.

Montgomery also alleges that she was terminated for making claims of race discrimination during her interview with Davis in connection with the sexual harassment investigation.  Again, even assuming that Montgomery can establish a *prima facie* case of retaliation as to her alleged race discrimination claims, Defendants have presented a legitimate, non-retaliatory reason for Montgomery's termination and Montgomery has not presented any evidence to show that this reason was a pretext for retaliation.

b.     *Race Discrimination Complaint*

Montgomery contends that she was terminated in retaliation for her statement to Warden Grubbs on July 11, 2003 that she would be willing to participate in a race discrimination complaint brought by other employees.  Defendants argue that Montgomery cannot establish a *prima facie* case of retaliation based upon these facts because she herself did not engage in protected conduct.  As stated above, it is unclear what constitutes protected conduct for the purpose of a § 1981 retaliation claim.  However, even assuming that Montgomery's statement to Warden Grubbs was protected conduct, and that she has succeeded in establishing a *prima facie* case of retaliation, she has failed to show that Defendants' legitimate, non-retaliatory reason for terminating her was a pretext for retaliation.

25

Therefore, because  Montgomery has failed to prove that her termination was due to retaliation in violation of § 1981 the individual Defendants are entitled to qualified immunity from personal liability for money damages on her § 1981 retaliation claims.

Montgomery's § 1981 claims for equitable relief against the individual Defendants are not barred by qualified immunity.  Nonetheless, for the reasons set forth in the discussion of qualified immunity, the Defendants actions did not violate § 1981, therefore summary judgment is due to be granted in favor of the Defendants as to all of Montgomery's § 1981 claims.

## V. Conclusion

For the reasons set forth above, it is hereby ORDERED that Defendants' Motion for Summary Judgment (Doc. # 49) is GRANTED.

A separate final judgment will be entered in accordance with this Memorandum Opinion and Order.

DONE this the 24th day of August, 2006.


_____
           /s/ Mark E. Fuller
CHIEF UNITED STATES DISTRICT JUDGE